AMERICAN TRADING & PRODUC-
TION CORPORATION

v.

THE ST. JOHN (Amboy Towboats, Inc., claimant-respondent.)

THE BALTIMORE TRADER.

THE ST. CHARLES.

No. A. 18949.

United States District Court,
E. D. New York.

July 30, 1953.

Hagen, Senecal & Eidenbach, New York City (Charles W. Hagen and Richard A. Hagen, New York City, of counsel), for libelant.

Pyne, Lynch & Smith, New York City (Warner Pyne, New York City, of counsel), for claimant-respondent.

INCH, Chief Judge.

In this admiralty suit libelant, American Trading & Production Corporation, as owner of the SS Port Republic (now named SS Baltimore Trader), seeks to recover damages sustained by said vessel on December 31, 1947 when it went aground at Steep Rocks in the vicinity of Hell Gate east of the Triborough Bridge. The libel alleges *in rem* liability of the attending tugs St. John and St. Charles, and *in personam* liability of their owner, the respondent Amboy Towboats, Inc.

Libelant engaged the services of Amboy Towboats, Inc. for two tugs to attend and assist the Port Republic from her anchorage off Pier 13, Stapleton, Staten Island up the East River and through Hell Gate to a dock at 138th St., Bronx, New York. Amboy Towboats, Inc. also furnished a licensed pilot, Captain Finley, one of its tugboat captains, to act as pilot of the vessel under a contract which expressly provided as follows:

"Pilotage: When the captain of any tug furnished to or engaged in the service of assisting a vessel which is making use of her own propelling power, goes on board such vessel, or any other licensed pilot goes on board such vessel, it is understood and agreed that such tugboat captain or licensed pilot becomes the servant of the owner of the vessel assisted in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting service and in respect to the handling of such vessel, and neither those furnishing the tugs and/or pilot nor the tugs, their owners, agents, charterers, operators or managers shall be liable for any damage resulting therefrom."

The Port Republic was a T–2 tanker approximately 525 feet in length, 68.2 feet in breadth and 39.2 feet in depth. The vessel was loaded with a cargo of fuel oil, shipped aboard at Texas.

The Port Republic left the Stapleton anchorage at 11:23 a. m. on December 31, 1947. The tugs, which were steam tugs of the Shipping Board class, took a position alongside the tanker at about her midships, the St. John on the tanker's port side and the St. Charles on the starboard side. Each tug had one manila line out from its bow to a bitt in the well deck on its side of the tanker, immediately forward of the bridge. The line put out by the St. John was 6 inches in circumference, and the St. Charles' line was 7 inches.

It was agreed between the master of the Port Republic and Captain Finley, the pilot furnished by respondent, that for this trip full harbor speed for the vessel would be 60 revolutions, half speed 40 revolutions and slow speed 20 revolutions. According to both her deck and engine room bell books, the vessel proceeded generally at slow speeds, that is slow ahead or half ahead, from the time she left Stapleton at 11:23 a. m. until 12:54 p. m. However, at 12:54 p. m. her engines were increased to full ahead and remained at that speed for at least 33 minutes, or a few minutes before she stranded at 1:30 p. m.

The ship with the tugs alongside, hanging on, proceeded up the East River and at Blackwell's Island held to the channel to the west of the Island. Throughout the entire trip from Stapleton to the point of stranding, the Port Republic used her own engines and steering gear.

There is substantial testimony from the tug crews that while the tanker proceeded up the channel to the west of

Blackwell's Island against an ebb tide both tugs experienced considerable difficulty in maintaining their positions alongside the tanker, and this is borne out by the subsequent events. It was their testimony that despite the efforts of the tug captains at their wheels, the excessive speed of the Port Republic caused the tugs to list, pitch and roll and at times to "climb" the side of the tanker.

When the Port Republic reached a point in the East River, which the witnesses variously described as somewhere between 62nd Street and 81st Street, Manhattan, the line from the St. John parted. The tug attempted to again catch up with the Port Republic, but was unable to do so. Shortly thereafter, and before the Port Republic reached the Hallets Point light, the master of the St. Charles blew an alarm and caused his line to be cast off the Port Republic. Fearing that his tug could not pass between the tanker and submerged rocks off Hallets Point, he stopped the tug's engines, but because of the suction of the Port Republic or the ebb tide, or both, the forward end of the St. Charles was drawn toward the Port Republic. The master of the St. Charles then reversed his engines full astern, but the bow of the tug came into collision with the starboard side of the tanker near the stern. This contact damaged the tug's superstructure and cracked the throttle valve on the tug's main engine, permitting steam to escape, and disabling the tug.

It is clear from the deposition of Captain Hicks, master of the Port Republic, that the collision occurred before the tanker made the first turn at Hallets Point, that is the first of two turns going through Hell Gate. He stated:

"A. As I visualize it in my mind and as I see it, it required the execution of two turns, one slightly to the right, and then one much more pronounced to the port.

"Q. And that was some time prior to the execution of those two turns that this occurrence [the collision] occurred? A. Yes, just prior."

As to what transpired after the tugs left the ship the Captain testified:

"A. After we found ourselves without tugs in discussion between Captain Finley, the pilot, and myself he told me we would need more revolutions on the engine to negotiate the turns if we were at all to come through Hell Gate. As I am reminded by my statement to the Coast Guard, her maneuvering speed was sixty revolutions for full speed. At the moment I was advised by Captain Finley of needing more speed I called the engine room by telephone, as I recall, and advised them to give us eighty revolutions for full speed. That was an increase of twenty revolutions above what we were maneuvering with".

He also agreed that he testified at the Coast Guard hearing as follows:

"Q. What transpired from the time the last tug left you? A. There is a sort of double bend there; you have to make a slight turn to the right, and a more pronounced turn to the left. The vessel made the first slight turn to the right all right, and the pilot gave the order to the quartermaster for hard left rudder, and with the additional 80 revolutions; and he said: 'Give me more speed, Captain.' And I personally grabbed the telephone and jingled it ahead. We made about three more revolutions. * * * We got about three more revolutions, and I noticed the tachometer in the wheel house, and I noticed and closely observed the ship and saw she was not getting rudder action sufficient to bring the bow against the current at that time. I kept watching, and asked the pilot, 'Is she going to make it, Captain?' And he said 'I don't know. She is not making it,' or something. That was the substance of his remark. We both in silence watched this ship for a few minutes, at which time he gave order for full ahead [sic],

and I complied with his orders immediately, giving the vessel full astern—three jingles, and the ship engines were put astern, and I personally observed 85 revolutions for full astern bell."

As the vessel's engines were reversed the port anchor was dropped, but the tanker stranded on Steep Rocks midway between the Triborough and Railroad Bridges.

Libelant contends that both tugs were at fault "for failing to comply with pilot's orders to remain fast alongside the vessel and for deserting the ship without orders and without notification to the pilot of their intention to do so; that the subsequent stranding of the Baltimore Trader resulted jointly from the violent collision between the St. Charles and the ship while the latter was endeavoring to make the port turn around Negro Point, and from the fact that after the collision the St. John was not in her assigned position where she could have prevented the stranding at Steep Rocks." (Brief p. 4).

■ However, I find no merit in these contentions for the reason that the credible evidence plainly establishes that the proximate and sole cause of the grounding of the Port Republic was her excessive speed.

It is undisputed that, barring an emergency, a loaded T–2 tanker could proceed safely through Hell Gate under these tide and weather conditions without the assistance of tugs. Here Captain Finley, the pilot, testified that he knew that both tugs were no longer in tow and he did not consider the tanker in any danger. He admitted that he could have slowed the tanker down at any time, except when making the turns. The record is clear, however, that instead of doing so, he attempted to negotiate the turns by increasing an already excessive speed of 60 revolutions to 80 and then to 83 revolutions. Two experienced and well qualified Hell Gate pilots, Captain Howell and Captain Ball testified in substance that a T–2 tanker should be taken through Hell Gate at 10 to 20 revolutions, that is at dead slow or slow ahead, and if extra speed became necessary to negotiate the turns, then the speed should be increased temporarily to approximately half speed. At one point in the trial Captain Finley conceded that 60 revolutions would endanger the tugs, and that ordinarily the tugs could not keep up with the Port Republic if she were making that speed. He conceded testifying at the Coast Guard hearing:

"Q. In other words, you would have to be going more than forty revolutions to be at such a speed that the tugs couldn't keep up with you? A. We would have to be doing sixty, at least that, and that would be normal as the speed of the ship. With the tugs away from the ship and free of the ship that would be a dangerous proposition then, because the force of speed would carry the tugs to us."

He also conceded that he had testified at the Coast Guard hearing that the Port Republic was proceeding up the East River at 40 revolutions; that 40 revolutions was the most speed he made before arriving at Hell Gate and that he increased his speed to 60 revolutions to make the swing at Hallets Point. Thus an explanation of the accident might be that the pilot was unaware that the tanker, as has been conceded, was making 60 revolutions through the East River and then increased to 80 and 83 revolutions through the turns of Hell Gate.

■ I do not find any fault on the part of either the tug St. John or the tug St. Charles. Libelant contends that the St. John's line was inadequate for the operation involved and that she should have used at least a 7 inch line. The proof establishes conclusively, however, that the line was in good condition and without any defect. Libelant had the line examined by two experts, but failed to call them as witnesses or explain their absence. In addition to the testimony of Captains Howell and Ball that a 6 inch line was entirely proper

for this operation and that they had used such lines on tugs through Hell Gate many times, respondent offered the testimony of two engineers, one of whom had conducted a detailed laboratory test of the parted line, to the effect that the rope was in a good, sound condition. Respondent also presented evidence that the rope was purchased two months before the accident and issued to the tug only two or three weeks before the accident.

Thus the evidence favors a finding that the St. John's line parted not because of any defect or inadequacy but because it was subjected to an excessive strain due to the speed of the Port Republic. At full speed the tugs could make about 9 knots and for brief periods with the "bypass" open about 9½ knots. The testimony of the tug crews to the effect that the Port Republic exceeded this speed is substantiated by the testimony of a disinterested witness, Captain Nelson of the tug M & J Tracy. He said his tug was proceeding full ahead, at 7 or 8 knots an hour, up the East River and that the Port Republic passed him at about 41st Street at a speed which he estimated to be 10 knots. Libelant also called Professor Louis A. Baier, head of the Department of Naval Architecture and Marine Engineering at the University of Michigan. As a member of the American Bureau of Shipping he had made a special study of T-2 tankers. It was his opinion that at 60 revolutions a T-2 tanker would make 10¼ knots through the water. The Port Republic's log book and bell books were charted by Professor Baier for the day's run on this vessel on this voyage for December 28, 1947, and he testified that the vessel's actual performance fully corroborated his computations as to what a typical T-2 tanker was built to do and should do. This evidence was further corroborated by Captain Howell, who was especially experienced in piloting T-2 tankers through Hell Gate. He testified from a memorandum which he had compiled from his experience in handling a large number of T-2 tankers that at 60 revolutions a T-2 tanker would do 10.36 knots.

■ Libelant also refers to testimony from the ship's crew that after the St. John's line parted a heaving line was offered to the tug in order to take aboard a new line, but that the tug captain refused it. It is argued that the tug master was at fault for refusing the line and in failing to again resume his position alongside the ship. Similarly it is argued that the tug St. Charles was at fault for having its line cast off from the ship without orders from the ship or notification to the bridge. I am satisfied, however, from the very substantial testimony of the crews of both tugs, and the other evidence offered by respondent, that the Port Republic's excessive speed made it impossible for the tugs to remain alongside, and that under all the circumstances, the tug captains acted prudently.

■ Another contention of libelant is that the St. Charles negligently collided with the Port Republic while the ship was making the second turn in Hell Gate, that is around Negro Point and that by reason of the collision the turning maneuver of the tanker was interrupted so that with the ebb tide on her port bow, she sheered and stranded. As already indicated, the collision was not due to any negligence on the part of the tug, and the testimony of the tanker's master clearly establishes that the collision occurred before the ship made the first turn into Hell Gate, that is at Hallets Point, so that the collision could not have changed or interfered with the course of the Port Republic in going around the second turn. He specifically stated: "The vessel made the first slight turn to the right all right, and the pilot gave the order to the quartermaster for hard left rudder, and with the additional 80 revolutions". It is also significant that this contention that the collision threw the tanker off course after it rounded Hallets Point was not alleged in the libel. The libel pleads only that the tugs "abandoned" the tanker and

that because the Port Republic was "without the assistance of the tugs", she was "unable to navigate safely through the strong currents of Hell Gate * * *".

As to this last allegation it may be said that even if the tugs could have remained alongside the tanker, the evidence indicates that the speed of the tanker and the position of the tugs would have made it impossible for the tugs to have rendered any effective assistance to the vessel.

The libel should be dismissed with costs.

Findings of fact and conclusions of law are being filed simultaneously herewith.

Settle decree.